UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20906-CR-MARTINEZ

MAGISTRATE JUDGE
BROWN

UNITED STATES OF AMERICA

vs.

ALCATEL-LUCENT TRADE
INTERNATIONAL, A.G.,
    f/k/a "Alcatel Standard, A.G.,"

                Defendant.
_____/

## PLEA AGREEMENT

The United States of America, by and through the Fraud Section of the Criminal Division

of the United States Department of Justice (the "Department of Justice" or the "Department"),

and the defendant, Alcatel-Lucent Trade International, A.G. ("Alcatel-Lucent Trade" or the

"Defendant"), which was formerly known as "Alcatel Standard, A.G.," by and through its

undersigned attorneys, and through its authorized representative, pursuant to authority granted by

the Alcatel-Lucent Trade Board of Directors, hereby submit and enter into this plea agreement

(the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

The terms and conditions of this Agreement are as follows:

### The Defendant's Agreement

1.      Alcatel-Lucent Trade agrees to waive indictment and plead guilty to a one-count

criminal Information filed in the Southern District of Florida charging Alcatel-Lucent Trade with

conspiracy to commit offenses against the United States in violation of Title 18, United States

Code, Section 371, that is, to violate the anti-bribery, books and records, and internal controls

provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Department in its investigation into all matters related to the conduct charged in the Information.

2.  The Defendant understands and agrees that this Agreement is between the Department and Alcatel-Lucent Trade and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Department will bring this Agreement and the cooperation of Alcatel-Lucent Trade, its direct or indirect affiliates, subsidiaries, and parent corporation, to the attention of other prosecuting authorities or other agencies, if requested by Alcatel-Lucent Trade.

3.  The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Alcatel-Lucent Trade Board of Directors in the form attached to this Agreement as Exhibit 1, or in similar form, represents that the signatures on this Agreement by Alcatel-Lucent Trade and its counsel are authorized by the Alcatel-Lucent Trade Board of Directors, on behalf of Alcatel-Lucent Trade.

4.  The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

5.  The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

    a.    to plead guilty as set forth in this Agreement;

    b. to abide by all sentencing stipulations contained in this Agreement;

    c. to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter;

    d. to commit no further crimes;

    e. to be truthful at all times with the Court;

    f. to pay the applicable fine and special assessment; and

    g. to work with its parent corporation in fulfilling the obligations described in Exhibit 2.

  6. The Defendant agrees that in the event Alcatel-Lucent Trade sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, Alcatel-Lucent Trade shall include in any contract for sale, merger, or transfer a provision fully binding the purchaser(s) or any successor(s) in interest thereto to the obligations described in this Agreement.

  7. The Defendant agrees to continue to cooperate fully with the Department, the Federal Bureau of Investigation (the "FBI"), and the U.S. Securities and Exchange Commission (the "SEC") in a manner consistent with applicable law and regulations including labor, data protection, privacy, and blocking statute laws, including Article 1 of French Law No. 68-678 of July 26, 1968, as amended by Law No. 80-538 of July 16, 1980 (the "Blocking Statute").  At the request of the Department, Alcatel-Lucent Trade shall also cooperate fully with foreign law enforcement authorities and agencies.  Alcatel-Lucent Trade shall, to the extent consistent with the foregoing, truthfully disclose to the Department all factual information not protected by a

valid claim of attorney-client privilege or work product doctrine protection with respect to the

activities of Alcatel-Lucent Trade and its affiliates, its present and former directors, officers,

employees, agents, consultants, contractors, and subcontractors, concerning all matters relating to

corrupt payments to foreign public officials or to employees of private customers or concerning

related internal controls or books and records about which Alcatel-Lucent Trade has any

knowledge and about which the Department, the FBI, the SEC, or, at the request of the

Department, any foreign law enforcement authorities and agencies, shall inquire. This obligation

of truthful disclosure includes the obligation of Alcatel-Lucent Trade to provide to the

Department, upon request, any non-privileged or non-protected document, record, or other

tangible evidence relating to such corrupt payments to foreign public officials or to employees of

private customers about which the aforementioned authorities and agencies shall inquire of

Alcatel-Lucent Trade, subject to the direction of the Department.

8.    The Defendant agrees that any fine or restitution imposed by the Court will be due

and payable within ten (10) business days of sentencing, and the Defendant will not attempt to

avoid or delay payments. The Defendant further agrees to pay the Clerk of the Court for the

United States District Court for the Southern District of Florida the mandatory special

assessment of $400 within ten (10) business days from the date of sentencing.

9.    The Defendant agrees that if the company, its parent corporation, or any of its

direct or indirect affiliates or subsidiaries issues a press release or holds a press conference in

connection with this Agreement, the Defendant shall first consult with the Department to

determine whether (a) the text of the release or proposed statements at any press conference are

true and accurate with respect to matters between the Department and the Defendant; and (b) the

4

Department has no objection to the release or statement. Statements at any press conference concerning this matter shall be consistent with this press release.

### The United States' Agreement

10.     In exchange for the guilty plea of Alcatel-Lucent Trade and the complete fulfillment of all of its obligations under this Agreement, the Department agrees it will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or its parent corporation, Alcatel-Lucent, S.A., relating to (a) any of the conduct described in the Statement of Facts, or (b) information disclosed by Alcatel-Lucent Trade or its parent company, Alcatel-Lucent, S.A., to the Department prior to the date of this Agreement. This paragraph does not provide any protection against prosecution for any corrupt payments, false accounting, or failure to implement internal controls or circumvention of internal controls, if any, made in the future by Alcatel-Lucent Trade or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by Alcatel-Lucent Trade pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of Alcatel-Lucent Trade, who may have been involved in any of the matters set forth in the Information, Statement of Facts, or in any other matters. Finally, the Department represents and agrees that it will file a Sentencing Memorandum in support of the proposed agreed-upon sentence that will include a description of (a) relevant facts, (b) the nature of the offenses, (c) the factors considered by the Department in reaching this agreement with the Defendant and related agreements with the Defendant's parent company and affiliated companies, and (d) Alcatel-Lucent Trade's cooperation, remediation, and compliance enhancements.

5

**Factual Basis**

11.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information are true and correct, that it is responsible for the acts of its present and former officers and employees described in the Statement of Facts attached here to and incorporated herein as Exhibit 3, and that the Statement of Facts accurately reflects Alcatel-Lucent Trade's criminal conduct.

**Defendant's Waiver of Rights, Including the Right to Appeal**

12.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Department has fulfilled all of its obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

13.     Alcatel-Lucent Trade knowingly, intelligently, and voluntarily waives its right to appeal the conviction in this case.  Alcatel-Lucent Trade similarly knowingly, intelligently, and voluntarily waives the right to appeal the sentence imposed by the Court.  In addition, Alcatel-

Lucent Trade knowingly, intelligently, and voluntarily waives the right to bring any collateral challenge, including challenges pursuant to Title 28, United States Code, Section 2255, challenging either the conviction, or the sentence imposed in this case, including a claim of ineffective assistance of counsel.  Alcatel-Lucent Trade waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) Alcatel-Lucent Trade violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Department is free to take any position on appeal or any other post-judgment matter.

## Penalty

14.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c)(3), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).  The parties agree that, in light of (a) the overall dispositions with Alcatel-Lucent, S.A., Alcatel-Lucent France, S.A., and Alcatel Centroamerica, S.A., and (b) the interrelationship among the charges and conduct underlying those dispositions, an application of the Alternative Fines Act, Title 18, United States Code, Section 3571(d), to this case would unduly complicate

or prolong the sentencing process, so that the maximum fine under the Sentencing Guidelines is $500,000, as provided in Title 18, United States Code, Section 3571(c)(3).

### Sentencing Recommendation

15.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Department and the Defendant have agreed to a specific sentence of a fine in the amount of $500,000 and a special assessment of $400. The Parties agree that this $500,000 fine and the $400 special assessment shall be paid to the Clerk of Court, United States District Court for the Southern District of Florida, within ten (10) business days after sentencing. The Defendant acknowledges that no tax deduction may be sought in connection with the payment of this $500,000 fine.

16.     Waiver of Pre-Sentence Report. The parties further agree, with the permission of the Court, to waive the requirement of a Pre-Sentence Investigation report pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing power. The parties agree, however, that in the event the Court orders the preparation of a pre-sentence report prior to sentencing, such order will not affect the agreement set forth herein.

17.     Consolidation of Plea and Sentencing. The parties further agree to ask the Court's permission to combine the entry of the plea and sentencing into one proceeding, and to conduct the plea and sentencing hearings of the Defendant in one proceeding. The parties agree, however, that in the event the Court orders that the entry of the guilty plea and sentencing hearing occur at separate proceedings, such an order will not affect the agreement set forth herein.

18.     Court Not Bound.  This agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

19.     Full Disclosure/Reservation of Rights.  In the event the Court directs the preparation of a Pre-Sentence Investigation report, the Department will fully inform the preparer of the pre-sentence report and the Court of the facts and law related to Alcatel-Lucent Trade's case.  Except as set forth in this Agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

**Breach of Agreement**

20.     The Defendant agrees that if it breaches this Agreement, commits any federal crime subsequent to the date of this Agreement, or has provided or provides deliberately false, incomplete, or misleading information in connection with this Agreement, the Department may, in its sole discretion, characterize such conduct as a breach of this Agreement.  In the event of such a breach, (a) the Department will be free from its obligations under the Agreement and may take whatever position it believes appropriate as to the sentence; (b) the Defendant will not have the right to withdraw the guilty plea; (c) the Defendant shall be fully subject to criminal

prosecution for any other crimes that it has committed or might commit, if any, including perjury and obstruction of justice; and (d) the Department will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding any of the information or materials provided by the Defendant pursuant to this Agreement, as well as the admitted Statement of Facts.

21.     In the event of a breach of this Agreement by Alcatel-Lucent Trade, if the Department elects to pursue criminal charges, or any civil or administrative action that was not filed as a result of this Agreement, then:

a.     Alcatel-Lucent Trade agrees that any applicable statute of limitations is tolled between the date of Alcatel-Lucent Trade's signing of this Agreement and the discovery by the Department of any breach by the Defendant plus one year; and

b.     Alcatel-Lucent Trade gives up all defenses based on the statute of limitations (as described in Paragraph 13), any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.

## Complete Agreement

22.     This document states the full extent of the agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement

shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR ALCATEL-LUCENT TRADE INTERNATIONAL, A.G.:**

Date: _12/20/10_                    By: _____
                                         STEPHEN R. REYNOLDS
                                         General Counsel


Date: _12/20/10_                    By: _____
                                         MARTIN J. WEINSTEIN
                                         Willkie Farr & Gallagher LLP


**FOR THE DEPARTMENT OF JUSTICE:**

                                         DENIS J. McINERNEY
                                         Chief, Fraud Section

Date: _12/20/10_                    By: _____
                                         CHARLES E. DUROSS
                                         Acting Deputy Chief, Fraud Section


Date: _12/20/10_                    By: _____
                                         ANDREW GENTIN
                                         Trial Attorney, Fraud Section


                                         United States Department of Justice
                                         Criminal Division
                                         1400 New York Ave., N.W.
                                         Washington, D.C. 20005
                                         (202) 353-7691

11

## GENERAL COUNSEL'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Alcatel-Lucent Trade International, A.G. ("Alcatel-Lucent Trade").  I understand the terms of this Agreement and voluntarily agree, on behalf of Alcatel-Lucent Trade, to each of its terms.  Before signing this Agreement, I consulted outside counsel for Alcatel-Lucent Trade.  Counsel fully advised me of the rights of Alcatel-Lucent Trade, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of Alcatel-Lucent Trade.  I have advised and caused outside counsel for Alcatel-Lucent Trade to advise the Board of Directors fully of the rights of Alcatel-Lucent Trade, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement.  Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Alcatel-Lucent Trade, in any way to enter into this Agreement.  I am also satisfied with outside counsel's representation in this matter.  I certify that I am General Counsel for Alcatel-Lucent, S.A., the parent corporation of Alcatel-Lucent Trade, and that I have been duly authorized by Alcatel-Lucent Trade to execute this Agreement on behalf of Alcatel-Lucent Trade.

Date: _12/20/10_____, 2010

ALCATEL-LUCENT, S.A. &
ALCATEL-LUCENT TRADE INTERNATIONAL, A.G.

By: _____
STEPHEN R. REYNOLDS
General Counsel

## CERTIFICATE OF COUNSEL

I am counsel for Alcatel-Lucent Trade International, A.G. ("Alcatel-Lucent Trade") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Alcatel-Lucent Trade documents and have discussed the terms of this Agreement with the Alcatel-Lucent Trade Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of Alcatel-Lucent Trade has been duly authorized to enter into this Agreement on behalf of Alcatel-Lucent Trade and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of Alcatel-Lucent Trade and is a valid and binding obligation of Alcatel-Lucent Trade.  Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of Alcatel-Lucent, S.A.  I have fully advised them of the rights of Alcatel-Lucent Trade, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of Alcatel-Lucent Trade to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _December 20_ , 2010

_____
MARTIN J. WEINSTEIN
Willkie Farr & Gallagher LLP
Counsel for Alcatel-Lucent Trade
    International, A.G.

**EXHIBIT 1**

## <u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."



## RESOLUTION OF THE BOARD OF DIRECTORS OF ALCATEL-LUCENT TRADE INTERNATIONAL AG, DATED JULY 28, 2010

In December 2009, Alcatel-Lucent S.A. and certain of its affiliates (hereinafter, "the Group") reached an agreement in principle with the United States Department of Justice (the "DOJ") and the United States Securities and Exchange Commission (the "SEC"), with a view to terminating an investigation of the Group under the United States Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 et seq. (the "FCPA"), which has been on-going since 2004.

Subsequent to this agreement in principle, the Group pursued negotiations with the DOJ and the SEC with a view to reaching a final agreement. A proposed final agreement, in the form of a *"Deferred Prosecution Agreement"* to be entered into between the DOJ and Alcatel-Lucent S.A. and a *"Plea Agreement"* to be entered into between the DOJ and Alcatel-Lucent Trade International AG, among other Agreements to be entered into between the DOJ and other entities of the Group, have substantially been agreed upon between the relevant parties. The *Deferred Prosecution Agreement* and *Plea Agreement,* as currently contemplated, provide a certain number of obligations and declarations on behalf of the Group, including:

- An acknowledgment by Alcatel-Lucent S.A. that the DOJ will file a two-count criminal Information against Alcatel-Lucent S.A. in the United States District Court for the Southern District of Florida charging violations of the internal controls and books and records provisions of the FCPA, 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), and 78ff(a).

- The appointment of a French National or French Firm to act as Corporate Compliance Monitor for the period indicated in the *Deferred Prosecution Agreement* (*i.e.,* at least 3 years starting on the date of its retention).

- An undertaking by Alcatel-Lucent Trade International AG, *inter alia,* to:

    (i) waive indictment and plead guilty to a one-count criminal Information filed in the United States District Court for the Southern District of Florida charging Alcatel-Lucent Trade International AG with conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371, that is, to violate the anti-bribery, books and records, and internal controls provisions of the FCPA; and

    (ii) pay to the DOJ, by way of fine, a sum of $500.000.



In consideration for these and other undertakings of the Group, the DOJ undertook to stay any proceedings against Alcatel-Lucent S.A. for the violations referred to in Attachment A of the *Deferred Prosecution Agreement* and not to pursue the criminal Information filed against Alcatel-Lucent S.A. in the United States District Court for the Southern District of Florida.

After deliberation, and pursuant to the advice of the Group's General Counsel, together with outside counsel, as to Alcatel-Lucent Trade International AG's rights, possible defenses, the United States Organizational Sentencing Guidelines' provisions, and the consequences of entering into the *Plea Agreement* with the DOJ, the Board of Directors of Alcatel-Lucent Trade International AG hereby approves unanimously the terms and conditions of the *Plea Agreement* to be entered into between the DOJ and Alcatel-Lucent Trade International AG.

The Board of Directors consequently appoints Mr. Stephen R. Reynolds, Group General Counsel, to, for and on behalf of Alcatel-Lucent Trade International AG, (i) execute the *Plea Agreement* substantially in such form as reviewed by this Board of Directors at this meeting with such changes as he, or his delegate, may approve; (ii) take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and (iii) enter a guilty plea pursuant to the one-count criminal Information filed in the United States District Court for the Southern District of Florida charging Alcatel-Lucent Trade International AG with conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 and, to that end, finalize, initial and sign, any and all documents required of Alcatel-Lucent Trade International AG under the *Plea Agreement*, and to make any and all declarations before the appropriate courts to abide by the terms of the *Plea Agreement* and more generally to take any action that is necessary or expedient for the purposes of complying with the *Plea Agreement*.

**Alcatel-Lucent Trade International AG**

T. Keller

President of the Board

## EXHIBIT 2

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, policies, and procedures

regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et*

*seq.,* and other applicable anti-corruption laws, Alcatel-Lucent Trade International, A.G., (f/k/a

"Alcatel Standard, A.G.") and its subsidiaries (collectively, "Alcatel-Lucent Trade" or the

"company") agree to continue to conduct, in a manner consistent with all of its obligations under

this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, Alcatel-Lucent Trade agrees to adopt new or to modify

existing internal controls, policies, and procedures in order to ensure that it maintains:  (a) a

system of internal accounting controls designed to ensure that Alcatel-Lucent Trade makes and

keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption

compliance code, standards, and procedures designed to detect and deter violations of the FCPA

and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited

to, the following elements to the extent they are not already part of the company's existing

internal controls, policies, and procedures:

1.      Alcatel-Lucent Trade will develop and promulgate a clearly articulated and

visible corporate policy against violations of the FCPA, including its anti-bribery, books and

records, and internal controls provisions, and other applicable foreign law counterparts

(collectively, the "anti-corruption laws"), which policy shall be memorialized in a written

compliance code.

2.      Alcatel-Lucent Trade will ensure that its senior management provide strong,

explicit, and visible support and commitment to its corporate policy against violations of the anti-

corruption laws and its compliance code.

3.    Alcatel-Lucent Trade will develop and promulgate compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and Alcatel-Lucent Trade's compliance code, and Alcatel-Lucent Trade will take appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against foreign bribery by personnel at all levels of the company.  These anti-corruption standards and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of Alcatel-Lucent Trade in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"), to the extent that agents and business partners may be employed under Alcatel-Lucent Trade's corporate policy.  Alcatel-Lucent Trade shall notify all employees that compliance with the standards and procedures is the duty of individuals at all levels of the company.  Such standards and procedures shall include policies governing:

a.    gifts;

b.    hospitality, entertainment, and expenses;

c.    customer travel;

d.    political contributions;

e.    charitable donations and sponsorships;

f.    facilitation payments; and

g.    solicitation and extortion.

4.     Alcatel-Lucent Trade will develop these compliance standards and procedures, including internal controls, ethics, and compliance programs on the basis of a risk assessment addressing the individual circumstances of the company, in particular the foreign bribery risks facing the company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

5.     Alcatel-Lucent Trade shall review its anti-corruption compliance standards and procedures, including internal controls, ethics, and compliance programs, no less than annually, and update them as appropriate, taking into account relevant developments in the field and evolving international and industry standards, and update and adapt them as necessary to ensure their continued effectiveness.

6.     Alcatel-Lucent Trade will assign responsibility to one or more senior corporate executives of Alcatel-Lucent Trade for the implementation and oversight of Alcatel-Lucent Trade's anti-corruption policies, standards, and procedures. Such corporate official(s) shall have direct reporting obligations to independent monitoring bodies, including internal audit, Alcatel-Lucent Trade's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

7.     Alcatel-Lucent Trade will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the

3

maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.

8.  Alcatel-Lucent Trade will implement mechanisms designed to ensure that its anti-corruption policies, standards, and procedures are effectively communicated to all directors, officers, employees, and, where appropriate, agents and business partners.  These mechanisms shall include:  (a) periodic training for all directors, officers, and employees, and, where necessary and appropriate, agents and business partners; and (b) annual certifications by all such directors, officers, and employees, and, where necessary and appropriate, agents, and business partners, certifying compliance with the training requirements.

9.  Alcatel-Lucent Trade will maintain, or where necessary establish, an effective system for:

a.  Providing guidance and advice to directors, officers, employees, and, where appropriate, agents and business partners, on complying with Alcatel-Lucent Trade's anti-corruption compliance policies, standards, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the company operates;

b.  Internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners, not willing to violate professional standards or ethics under instructions or pressure from hierarchical superiors, as well as for directors, officers, employee, and, where appropriate, agents and business partners, willing to report breaches of the law or professional standards or ethics concerning anti-corruption occurring within the company, suspected criminal conduct, and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption

4

laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners; and

       c.     Responding to such requests and undertaking appropriate action in response to such reports.

     10.    Alcatel-Lucent Trade will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and Alcatel-Lucent Trade's anti-corruption compliance code, policies, and procedures by Alcatel-Lucent Trade's directors, officers, and employees. Alcatel-Lucent Trade shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, ethics, and compliance program and making modifications necessary to ensure the program is effective.

     11.    To the extent that the use of agents and business partners is permitted at all by Alcatel-Lucent Trade, it will institute appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

       a.     Properly documented risk-based due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

       b.     Informing agents and business partners of Alcatel-Lucent Trade's commitment to abiding by laws on the prohibitions against foreign bribery, and of Alcatel-Lucent Trade's ethics and compliance standards and procedures and other measures for preventing and detecting such bribery; and

       c.     Seeking a reciprocal commitment from agents and business partners.

12.     Where necessary and appropriate, Alcatel-Lucent Trade will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws, and regulations or representations and undertakings related to such matters.

13.     Alcatel-Lucent Trade will conduct periodic review and testing of its anti-corruption compliance code, standards, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and Alcatel-Lucent Trade's anti-corruption code, standards and procedures, taking into account relevant developments in the field and evolving international and industry standards.

## EXHIBIT 3

### STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the Plea

Agreement between the United States Department of Justice, Criminal Division, Fraud Section

(the "Department") and ALCATEL-LUCENT TRADE INTERNATIONAL, A.G. (f/k/a "Alcatel

Standard, A.G."), and the parties hereby agree and stipulate that the following information is true

and accurate.  ALCATEL-LUCENT TRADE INTERNATIONAL, A.G., admits, accepts, and

acknowledges that it is responsible for the acts of its predecessor company's officers, employees,

and agents as set forth below.  Had this matter proceeded to trial, the Department would have

proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth

in the criminal Information.  This evidence would establish the following:

2.      **Alcatel, S.A.** ("**Alcatel**"), was a corporation organized under the laws of France

with its principal offices in Paris, France.  In late 2006, an Alcatel subsidiary merged with Lucent

Technologies, Inc. in the United States (hereinafter the "2006 Merger")  and Alcatel S.A.

changed its name to Alcatel-Lucent, S.A.  Alcatel was a worldwide provider of a wide variety of

telecommunications equipment and services and other technology products.  From 2001 to 2005,

Alcatel employed between 55,000 and 100,000 employees through the Alcatel Group.  The

Alcatel Group operated in more than 130 countries, directly and through certain wholly owned

and indirect subsidiaries, including in France, the United States of America, and, as set forth

more fully below, in Costa Rica, Honduras, Malaysia, and Taiwan.  The Alcatel Group

maintained an office in Miami, Florida, in the Southern District of Florida, through which

Alcatel pursued business throughout Central and South America.   From at least 2000 until late

2006, American Depositary Shares of Alcatel were registered with the U.S. Securities and

Exchange Commission ("SEC") and traded on the New York Stock Exchange as American Depositary Receipts ("ADRs"). Accordingly, Alcatel was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

3.     Defendant **ALCATEL-LUCENT FRANCE, S.A.**, which was known before the 2006 Merger as "Alcatel CIT, S.A." (hereinafter "**ALCATEL CIT**"), was headquartered in Vélizy, France, just outside Paris. ALCATEL CIT was a wholly owned subsidiary of Alcatel, and was incorporated in France. Accordingly, ALCATEL CIT was a "person other than an issuer or a domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3. In the 1990s and continuing until at least late 2006, ALCATEL CIT was a commercial arm of Alcatel and was responsible for contracting with telecommunications providers, including many telecommunications providers owned by foreign governments, to sell Alcatel's telecommunications equipment and services and other technology products. Throughout the relevant time period, ALCATEL CIT had more than 7,000 employees, and its financial results were included in the consolidated financial statements that Alcatel filed with the SEC. ALCATEL CIT and its employees had regular communications with, and ALCATEL CIT employees traveled to and met with, Alcatel personnel located in the office in Miami, Florida, in the Southern District of Florida. Such communications and meetings involved, among other things, discussions about payments to third-party consultants, who passed on some or all of such payments to foreign officials in exchange for obtaining or retaining business. ALCATEL CIT also maintained at least one bank account in the United States through which it paid money to third-party consultants that it knew were going to pass on some or all of that money to foreign officials in exchange for obtaining or retaining business.

2

4.     Defendant **ALCATEL-LUCENT TRADE INTERNATIONAL, A.G.**, which was known before the 2006 Merger as "Alcatel Standard, A.G." (hereinafter **"ALCATEL STANDARD"**), was headquartered in Basel, Switzerland.  ALCATEL STANDARD was a wholly owned subsidiary of Alcatel, and was incorporated in Switzerland.  Accordingly, ALCATEL STANDARD was a "person other than an issuer or a domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3.  ALCATEL STANDARD was responsible for entering into most agreements with consultants worldwide on behalf of Alcatel, ALCATEL CIT, and certain other subsidiaries of Alcatel.  Throughout the relevant time period, ALCATEL STANDARD had approximately a dozen employees, and its financial results were included in the consolidated financial statements that Alcatel filed with the SEC. ALCATEL STANDARD and its employees had regular communications, including telephone calls, facsimiles, and email, with Alcatel personnel located in the office in Miami, Florida, in the Southern District of Florida.  Such communications involved, among other things, discussions about payments to third-party consultants, who passed on some or all of such payments to foreign officials in exchange for obtaining or retaining business.  ALCATEL STANDARD also made some payments to third-party consultants via a correspondent account in the United States.

5.     Defendant **ALCATEL CENTROAMERICA, S.A.**, which was known before the 2006 Merger as "Alcatel de Costa Rica, S.A." (hereinafter **"ACR"**), was formed under the laws of Costa Rica and was headquartered in San Jose, Costa Rica.  ACR was a wholly owned subsidiary of Alcatel.  Accordingly, ACR was a "person other than an issuer or a domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3.  ACR was responsible for the day-to-day commercial operations of Alcatel in Costa Rica and Honduras

3

during the relevant time period. Throughout the relevant time period, ACR had approximately fifty employees, and its financial results were included in the consolidated financial statements that Alcatel filed with the SEC. ACR and its employees had regular communications, including telephone calls, facsimiles, and emails, with Alcatel personnel located in the office in Miami, Florida, in the Southern District of Florida. Such communications involved, among other things, discussions about payments to third-party consultants, who passed on some or all of such payments to foreign officials in exchange for obtaining or retaining business.

6.     **Alcatel Network Systems Malaysia Sdn. Bhd. ("Alcatel Malaysia")** was founded as a joint venture in 1992 in Kuala Lumpur, Malaysia. Alcatel owned a majority share of and exercised control over the joint venture. Alcatel Malaysia's primary function was to provide product and sales support for Alcatel's business units in Malaysia during the relevant time period. Throughout the relevant time period, Alcatel Malaysia's financial results were included in the consolidated financial statements that Alcatel filed with the SEC.

7.     **Alcatel SEL, A.G. ("Alcatel SEL")** was formed under the laws of Germany and was headquartered in Stuttgart, Germany. Alcatel SEL was an indirect subsidiary of Alcatel. Alcatel SEL's Transport Automation Solutions business unit was responsible for bidding on an axle counting contract with the state-owned Taiwan Railway Administration in Taiwan during the relevant time period. Throughout the relevant time period, Alcatel SEL's financial results were included in the consolidated financial statements that Alcatel filed with the SEC.

8.     **Executive 1** was a citizen of France and served as the Chief Executive Officer of ALCATEL STANDARD in Basel, Switzerland. In this capacity, Executive 1's final approval was necessary for the hiring of almost all third-party consultants retained by Alcatel and its

4

subsidiaries, including ensuring that appropriate due diligence was conducted prior to the hiring of each consultant. Executive 1 executed the consultancy agreements with consultants throughout the world on behalf of ALCATEL STANDARD for the benefit of Alcatel, ALCATEL CIT, ACR, and certain other wholly owned and indirect subsidiaries of Alcatel and its joint ventures. Executive 1 was also responsible, in part, for the training of Alcatel's Country Senior Officers on how to process the required paperwork for retaining and using third-party consultants.

9.    **Christian Sapsizian** ("**Sapsizian**") was a citizen of France and was a long-term employee of Alcatel and its wholly owned subsidiary, ALCATEL CIT, eventually rising to the level of ALCATEL CIT's Director for Latin America. In this capacity, Sapsizian developed business in Latin America on behalf of Alcatel and its subsidiaries, including ACR, and spent part of his time working at Alcatel CIT headquarters in France and part of his time traveling throughout Latin America attending to Alcatel's business in the region.

10.    **Edgar Valverde Acosta** ("**Valverde**") was a citizen of Costa Rica and served as the President of ACR and Country Senior Officer ("CSO") for Costa Rica. As the President of ACR and CSO of Costa Rica, Valverde worked with Sapsizian. In this capacity, Valverde was responsible for developing business for Alcatel's services and equipment with Instituto Costarricense de Electricidad, S.A, the Costa Rican state-owned telecommunications authority. In Costa Rica, Valverde negotiated contracts with third-party consultants who worked on Alcatel's behalf in Costa Rica. Valverde was himself a former official at Instituto Costarricense de Electricidad, S.A.

5

11.    **Executive 2** and **Executive 3** served as Alcatel Malaysia's CSO and Chief Financial Officer, respectively.

12.    **Executive 4** was a citizen of Germany and served as Alcatel SEL's director of international business and sales of Transport Automation Solutions. In that capacity, Executive 4 was responsible for Alcatel's Taiwan Railway Administration contracts in Taiwan.

*Relevant Entities and Foreign Officials in Costa Rica*

13.    **Instituto Costarricense de Electricidad S.A. ("ICE")** was a wholly state-owned telecommunications authority in Costa Rica responsible for awarding and administering public tenders for telecommunications contracts. ICE was governed by a seven-member board of directors that evaluated and approved, on behalf of the government of Costa Rica, all bid proposals submitted by telecommunications companies. The Board of Directors was led by an Executive President, who was appointed by the President of Costa Rica. The other members of the Board of Directors were appointed by the President of Costa Rica and the Costa Rican governing cabinet. Accordingly, officers, directors and employees of ICE were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

14.    **Servicios Notariales, Q.C. S.A. ("Servicios Notariales")** was a purported consulting firm based in Costa Rica that entered into several sham consulting agreements with ALCATEL STANDARD on behalf of ALCATEL CIT to assist Alcatel in obtaining telecommunications contracts in Costa Rica.

15.    **Intelmar Costa Rica, S.A. ("Intelmar")** was a consulting firm based in Costa Rica that entered into numerous sham consulting agreements with ALCATEL STANDARD on

6

behalf of ALCATEL CIT to assist Alcatel in obtaining telecommunications contracts in Costa Rica. Intelmar maintained an office within ACR's office space in Costa Rica.

16.    **ICE Official 1** was a director of ICE and had a close relationship with **Senior Government Official 1**, who was a high-ranking official in the Costa Rican executive branch. **ICE Official 2, ICE Official 3, ICE Official 4, ICE Official 5**, and **ICE Official 6** were also officers, directors or employees of ICE. **Legislator 1** was a legislator in the Legislative Assembly (*Asamblea Legislativa*), which was the unicameral legislative branch of the Government of Costa Rica. ICE Officials 1-6, Senior Government Official 1, and Legislator 1 were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A), and they were each in a significant position to influence the policy decisions made by ICE and the contracts awarded by ICE.

*Relevant Entities and Foreign Officials in Honduras*

17.    **Empresa Hondureña de Telecomunicaciones ("Hondutel")** was a wholly state-owned telecommunications authority in Honduras, established under Honduran law, and it was responsible for providing telecommunications services in Honduras which, until late 2002, included evaluating and awarding telecommunications contracts on behalf of the government of Honduras. Several senior government officials sat on Hondutel's Board of Directors. Hondutel's operations were overseen by another Honduran government entity, Comisión Nacional de Telecomunicaciones. Profits earned by Hondutel belonged to the government of Honduras, though part of the profit was permitted to be used by Hondutel for its operations. Accordingly, employees of Hondutel were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

7

18.     **Comisión Nacional de Telecomunicaciones ("Conatel")** was the Honduran government agency that regulated the telecommunications sector in Honduras. Conatel issued licenses and concessions for fixed-line and wireless telephony, data transmission, and Internet services. Conatel was part of the Honduran executive branch under the Secretariat of Finance. Conatel's commissioners were appointed by the President of Honduras. Accordingly, officers, commissioners, and employees of Conatel were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

19.     **Honduran Consultant 1** was a purported consulting firm based in Honduras that entered into a sham consulting agreement with ALCATEL STANDARD to assist ALCATEL CIT and Alcatel Mexico (formerly known as "Alcatel Indetel"), a wholly owned subsidiary of Alcatel, in obtaining telecommunications contracts in Honduras on behalf of Alcatel.

20.     **Senior Government Official 2** was a high-ranking government official in the Honduran executive branch. **Hondutel Official** and **Conatel Official** were both high-ranking officials within Hondutel and Conatel, respectively. Senior Government Official 2, Hondutel Official, and Conatel Official were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A), and they were each in a significant position to influence the policy decisions made by the Honduran government, including the awarding of contracts by Hondutel prior to 2003.

*Relevant Entities in Malaysia*

21.     **Telekom Malaysia Berhad ("Telekom Malaysia")** was a state-owned and controlled telecommunications provider in Malaysia. Telekom Malaysia was responsible for awarding telecommunications contracts during the relevant time period. The Malaysian Ministry

of Finance owned approximately 43% of Telekom Malaysia's shares, had veto power over all major expenditures, and made important operational decisions. The government owned its interest in Telekom Malaysia through the Minister of Finance, who had the status of a "special shareholder." Most senior Telekom Malaysia officers were political appointees, including the Chairman and Director, the Chairman of the Board of the Tender Committee, and the Executive Director. Accordingly, officers, directors and employees of Telekom Malaysia were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

22.     **Malaysian Consultant 1** was a consulting firm with operations in Asia that entered into sham consulting agreements with ALCATEL STANDARD to provide market strategy reports focusing on technology.

23.     **Malaysian Consultant 2** was a consulting firm based in Asia that entered into a sham consulting agreement with ALCATEL STANDARD to provide a strategic intelligence report for Alcatel's Southeast Asia South Region.

### *Relevant Entities and Foreign Officials in Taiwan*

24.     **Taiwan Railway Administration ("TRA")** was the wholly state-owned authority in Taiwan responsible for managing, maintaining, and running passenger freight service on Taiwan's railroad lines. It was responsible for awarding and administering all public tenders in connection with Taiwan's railroad lines, including contracts to design, manufacture, and install an axle counting system to control rail traffic. TRA was an agency of Taiwan's Ministry of Transportation and Communications, a cabinet-level governmental body responsible for the regulation of transportation and communications networks and operations. Accordingly, officers

9

and employees of TRA were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

25.     **Taiwan International Standard Electronics, Ltd. ("Taisel")** was based in Taiwan and was a joint venture sixty-percent owned by Alcatel Participations, a wholly owned subsidiary of Alcatel, and forty-percent owned by a Taiwanese corporation.

26.     **Taiwanese Consultant 1** was a consulting firm based in Taiwan that entered into a consulting agreement with ALCATEL STANDARD to assist Alcatel SEL in obtaining axle counting contracts in Taiwan on behalf of Alcatel.

27.     **Taiwanese Consultant 2** was a consulting firm based in Taiwan which entered into a consulting agreement with Taisel on behalf of Alcatel to assist Alcatel SEL in obtaining axle counting contracts in Taiwan on behalf of Alcatel.

28.     **Legislator 2**, **Legislator 3**, and **Legislator 4** were all members of the Legislative Yuan, the unicameral legislative assembly of the Republic of China, whose territory consists of Taiwan, Penghu, Kinmen, and Matsu Islands.  Legislator 2, Legislator 3, and Legislator 4 were "foreign officials" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A), and they were in a significant position to influence the policy decisions made by the Taiwan government, including the awarding of contracts.

*Background Regarding Alcatel's Business Practices*
*and the State Of Its Internal Controls*

29.     Starting in the 1990s and continuing through at least late 2006, Alcatel pursued many of its business opportunities around the world through the use of third-party agents and consultants.  This business model was shown to be prone to corruption, as consultants were

repeatedly used as conduits for bribe payments to foreign officials (and business executives of private customers) to obtain or retain business in many countries. Alcatel also suffered from a de-centralized business structure, which permitted the different Alcatel employees around the world to initially vet the third-party consultants, and then rely on Executive 1 at ALCATEL STANDARD to perform due diligence on them. In practice, this de-centralized structure and approval process permitted corruption to occur, as the local employees were more interested in obtaining business than ensuring that business was won ethically and legally. Meanwhile, Executive 1 performed no due diligence of substance and remained, at best, deliberately ignorant of the true purpose behind the retention of and payment to many of the third-party consultants.

30.    Alcatel's organizational structure consisted of geographic Regions (each responsible for marketing and sales to customers within their territorial boundaries), Business Groups (further subdivided into Business Divisions, which were responsible for product-related activities, including the tendering process), and Units (legal entities with the ability to sign contracts and incur financial obligations). Alcatel's Units were structured in a matrix operating model that featured (a) large, autonomous legal entities with worldwide responsibility for researching, developing, and manufacturing particular product lines, and (b) similarly autonomous legal entities with a local presence in many countries responsible for the sale and support of those product lines in defined geographic areas. Units were located in specific geographical Regions and could also house specific Business Division operations.

31.    Alcatel typically set up a subsidiary or affiliated entity, such as ACR or Alcatel Malaysia, in a country to obtain contracts. A Country Senior Officer, or CSO, managed the subsidiary and selected consultants to solicit business for Alcatel from government officials in

that country.  The CSO engaged a consultant by preparing a form called a Service Agreement

Request ("SAR").  The SAR identified the consultant, the project for which the consultant was

being engaged, and the terms of the engagement.  The SAR required approval by the Alcatel

Region or Area President.  The SAR was accompanied by a Consultant Profile, a form that the

consultant was supposed to complete with information concerning its ownership, business

activities, capabilities, banking arrangements, and professional references.  The completed

Consultant Profile also required approval by the Area President.

      32.    A separate form called a Forecast of Sales Expenses ("FSE") was prepared to

document approval of the expense of using a sales and/or marketing consultant.  The FSE

identified the project and the amount of the fee or commission to be paid to the consultant, but

did not call for the consultant to be identified by name or for any information concerning the

consultant's qualifications or expected activities.  The FSE required the signatures of:  (a) the

Area President, to indicate his approval of the selection of the consultant; (b) the President of the

Business Division responsible for the product involved in the transaction, to indicate his approval

of the commission expense as a profit and loss charge to his Business Division; (c) the President

of the actual legal entity within Alcatel responsible for fulfilling the customer bid or contract, to

indicate his approval of the payment by his entity of the consultant's commission; and, finally,

(d) the Chief Executive Officer ("CEO") of ALCATEL STANDARD, namely, Executive 1.

      33.    Upon execution of the FSE by the Area President, the Business Division

President, and the President of the relevant legal entity, the SAR, Consultant Profile, and FSE

were transmitted to ALCATEL STANDARD.  ALCATEL STANDARD would then typically

request a Dun & Bradstreet report to confirm the existence and address of the consultant as stated

in the Consultant Profile.  Executive 1 would then sign the FSE to confirm that all of the

necessary approvals had been obtained.  Finally, Executive 1 would execute the contract with the

consultant, which at times called for the consultant to perform vaguely-described marketing

services.

34.     Executive 1 made no effort, or virtually no effort, to verify the information

provided by the consultant in the Consultant Profile, apart from using Dun & Bradstreet reports

to confirm the consultant's existence and physical address.  There was no requirement for the

provision of information regarding conflicts of interest or relationships with government

officials.  Indeed, even where the Dun & Bradstreet report disclosed problems, inconsistencies,

or red flags, typically nothing was done.  Thus, even if the consultant was a close relative of a

high-ranking foreign official, as was the case in some instances, this information was not listed

on the Consultant Profile and little or no effort was made to address such obvious conflicts and

risks.  Rather, if the paperwork was completed, regardless of any obvious issues (such as close

relationships with foreign officials or a clear lack of skill, experience or telecommunications

expertise), Executive 1 authorized hiring and paying the third-party consultant.

35.     In many instances, ALCATEL STANDARD would contract with the third-party

consultant and then ALCATEL CIT would pay the consultant, to the extent that Alcatel CIT was

the responsible legal entity.  Typically when Alcatel received payment for its telecommunications

services and equipment from its customers (which were often governments or agencies or

instrumentalities of governments), ALCATEL CIT would then pay the consultant who assisted in

securing that business.  As such, the payments by ALCATEL CIT to the agents retained by

ALCATEL STANDARD occurred over a number of years, and because of the value of many of

these contracts, the payments made to these consultants involved millions of dollars paid out over many years. To pay this money, among other things, ALCATEL CIT maintained a bank account at ABN Amro Bank in New York, New York, which was used, in part, to pay third-party consultants located around the world.

36.     Often senior executives at ALCATEL CIT, ALCATEL STANDARD, and ACR, among others, knew bribes were being paid, or were aware of the high probability that many of these third-party consultants were paying bribes, to foreign officials to obtain or retain business. For example, in a significant number of instances, the consultant contracts were executed *after* Alcatel had already obtained the customer business, the consultant commissions were excessive, and lump sum payments were made to the consultants that did not appear to correspond to any one contract. In other instances, the same person would establish more than one consulting company, and ALCATEL STANDARD would retain those multiple companies (knowing or purposefully ignoring that they were owned and operated by the same person). This would make it appear that the commission rate paid to the consulting company was not excessive, when in truth and in fact, the aggregate commission rate was exorbitant, thereby enabling the consultant to make payments to foreign officials.

37.     In order to further conceal the illegal nature of these business practices, ALCATEL CIT and ACR employees sometimes employed aliases in their emails to keep secret the names of foreign officials who were receiving bribes and who were providing Alcatel entities with non-public information.

38.     ALCATEL CIT, ALCATEL STANDARD, ACR, and certain employees of ALCATEL CIT, ALCATEL STANDARD, and ACR knew, or purposefully ignored, that many

14

of the SARs and FSEs did not accurately reflect the true nature and purpose of the agreements. Likewise, ALCATEL CIT, ALCATEL STANDARD, ACR, and certain employees of ALCATEL CIT, ALCATEL STANDARD, and ACR knew, or purposefully ignored, that many of the invoices submitted by various third-party consultants falsely claimed that legitimate work had been completed, while the true purpose of the monies sought by the invoices was to funnel all or some of the money to foreign officials, directly or indirectly. Moreover, ALCATEL CIT, ALCATEL STANDARD, ACR, and certain employees of ALCATEL CIT, ALCATEL STANDARD, and ACR knew, or purposefully ignored, that the payments in connection with the SARs, FSEs, and invoices were going to be passed to foreign officials. These transactions were designed to circumvent Alcatel's internal controls system and were further undertaken knowing that they would not be accurately and fairly reflected in ALCATEL CIT, ALCATEL STANDARD, and ACR's books and records, which were included in the consolidated financial statements that Alcatel filed with the SEC.

### Conduct in Costa Rica

39.     In or around 2001, Valverde and Sapsizian, acting on behalf of ACR and ALCATEL CIT, respectively, negotiated consultancy agreements on behalf of ALCATEL CIT with two Costa Rican consultants, which were intended to make improper payments to Costa Rican government officials in exchange for telecommunications contracts. The two consultants were Servicios Notariales, which was headed by Valverde's brother-in-law, and Intelmar. Both consultants had many personal contacts at ICE.

40.     ALCATEL STANDARD, on behalf of ALCATEL CIT, executed at least five consulting agreements with Servicios Notariales, in which ALCATEL STANDARD on behalf of

ALCATEL CIT, promised to pay Servicios Notariales a percentage of the value of a specific contract obtained from ICE. This percentage was as high as 9.75%, a much higher commission rate than Alcatel normally awarded to a legitimate consultant. Executive 1 of ALCATEL STANDARD signed each of these consulting agreements. In return for the commissions, the agreements required Servicios Notariales to perform vaguely-described marketing and advisory services. Servicios Notariales created approximately eleven phony invoices between 2001 and 2003, totaling approximately $14.5 million, purportedly for commissions related to the contracts awarded to Alcatel, and submitted those invoices, through Valverde at ACR, to ALCATEL CIT.

41.     Similarly, ALCATEL STANDARD, on behalf of ALCATEL CIT, entered into at least four consulting agreements with Intelmar to assist Alcatel in obtaining telecommunications contracts with ICE. Executive 1 of ALCATEL STANDARD signed each of these consulting agreements. The agreements required Intelmar to perform vaguely-described advisory services. Intelmar subsequently created approximately seven invoices reflecting largely inflated commissions totaling approximately $3 million between 2001 and 2004, purportedly for commissions related to the contracts awarded to Alcatel, and submitted those invoices to ALCATEL CIT.

42.     During this time period, Sapsizian's supervisor, the President of Area 1 (formerly known as the Chief Operating Officer for Latin America), worked in the Miami office, in the Southern District of Florida, and signed the Consultant Profile forms for Servicios Notariales and Intelmar and approved more than $18 million in payments to the consultants despite their huge amounts. According to Sapsizian, the President of Area 1 told him on several occasions that he

16

knew he was "risking jail time" as a result of his approval of these payments, which he understood would, at least in part, ultimately wind up in the hands of public officials.

43.     Following the approval by the President of Area 1, Executive 1 also approved the retention of and payments to Servicios Notariales and Intelmar despite some obvious indications that these "consultants" were performing little or no work yet receiving millions of dollars in payments reflecting a significant percentage of value of the entire transaction.  Indeed, Alcatel had three consultants assisting on ICE projects at that time.  But Executive 1 turned a blind eye to this and other evidence, which made it substantially certain that some part of these payments would be passed on to foreign officials to assist in obtaining or retaining business.

44.     Alcatel, ALCATEL CIT, ALCATEL STANDARD, and ACR conducted insufficient due diligence of Servicios Notariales and Intelmar.  Neither Alcatel nor any of its subsidiaries took sufficient steps to ensure that the consultants were complying with the FCPA or other relevant anti-corruption laws.

45.     In or around November 2000, prior to a formal vote by the ICE Board of Directors, Sapsizian and Valverde offered ICE Official 1 1.5% to 2% of the value of a future contract to develop a Global System for Mobile ("GSM") technology network in Costa Rica and to provide 400,000 lines of mobile telephone service (the "400K GSM Contract") in exchange for ICE Official 1's assistance in favor of opening a bid round for a GSM-based mobile network, rather than a network based on a different technology not offered by Alcatel (yet that was offered by Alcatel's competitors).  ICE Official 1 accepted the offer and subsequently agreed to share part of this fee with Senior Government Official 1.  Subsequently, ICE Official 1 used his

17

influence, and the ICE Board later voted to open a bid round for developing a mobile network in Costa Rica using the GSM technology that Alcatel was offering.

46.    On or about June 12, 2001, in part as a result of ICE Official 1's influence, ICE awarded ALCATEL CIT a separate contract, valued at approximately $44 million, to supply equipment for ICE's fixed network (the "Fixed Network Contract").

47.    On or about August 28, 2001, in part as a result of ICE Official 1's influence, ICE awarded Alcatel CIT the 400K GSM Contract described above in Paragraph 45. This contract was valued at approximately $149.5 million.

48.    After Alcatel received the two ICE contracts described above, from in or around December 2001 to in or around October 2003, ALCATEL CIT wire transferred approximately $14.5 million from its account at ABN Amro Bank in New York to an account at a correspondent bank, the International Bank of Miami in the Southern District of Florida, to be further credited to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica. This amount of money bore no relation to any actual services provided by Servicios Notariales because it was, in reality, used in large part to make bribe payments to Costa Rican government officials. Specifically, Servicios Notariales used at least $7 million of that money to pay the following Costa Rican government officials for assisting ALCATEL CIT in obtaining and retaining business in Costa Rica, including:

| Official | Approximate Amount of Bribe |
| --- | --- |
| ICE Official 1 | $2,560,000 and $100,000 in certificates of deposit |
| Senior Government Official 1 | $950,000 (through the ICE Official 1) |

18

| ICE Official 2 | $945,000 |
| ICE Official 3 | $145,000 |
| ICE Official 4 | $110,000 |
| ICE Official 5 | $1,300,000 |
| Legislator 1 | $550,000 |

49.     Valverde and Sapsizian each received kickbacks from Servicios Notariales. Sapsizian received more than $300,000 from Servicios Notariales, an amount wired to a Panamanian bank account held by an entity he controlled.  Valverde and his family members received more than $4.7 million in kickbacks from Servicios Notariales.

50.     In addition, from in or around 2001 to in or around May 2004, ALCATEL CIT wire transferred from its account at ABN Amro Bank in New York approximately $3.9 million to Intelmar in Costa Rica.  This amount of money bore no relation to actual services provided by Intelmar and also was used to make bribe payments to Costa Rican government officials.  For example, Intelmar made payments from in or around December 2002 to in or around October 2003 totaling approximately $930,000 to ICE Official 6.

51.     Alcatel's efforts in Costa Rica were further rewarded on or about May 23, 2002, when ICE awarded ALCATEL CIT a third contract, for additional switching equipment for the fixed network, valued at approximately $109.5 million.

52.     Moreover, Sapsizian, on behalf of ALCATEL CIT, approved the payment of approximately $25,000 in travel, hotel, and other expenses incurred by ICE officials during a primarily pleasure trip to Paris in or around October 2003 to discuss the GSM contract. Sapsizian instructed an ALCATEL CIT employee to pay for some of these expenses in cash to

19

conceal the payments and avoid leaving a paper trail leading to Alcatel. This trip was partially intended to reward these government officials for providing Alcatel with lucrative contracts, and the expenses were not bona fide promotional expenses under Title 15, United States Code, Section 78dd-3(c)(2).

53. Through the above-referenced conduct, employees of ALCATEL CIT, ALCATEL STANDARD, and ACR knowingly circumvented Alcatel's internal controls system and made inaccurate and false entries in the books and records of ALCATEL CIT, ALCATEL STANDARD, and ACR, whose financial results were included in the consolidated financial statements of Alcatel submitted to the SEC. As a result of the contracts won by ALCATEL CIT in Costa Rica as a result of bribe payments, Alcatel earned approximately $23,661,000 in profits.

### *Conduct in Honduras*

54. Besides operating in Costa Rica, ACR provided assistance to Alcatel de Honduras S.A., a wholly owned subsidiary of Alcatel which ran operations in Honduras. Employees of ACR, along with Sapsizian, pursued business opportunities on behalf of Alcatel in Honduras with Hondutel and Conatel. ALCATEL CIT and Alcatel Mexico pursued business in Honduras by retaining certain consultants through ALCATEL STANDARD. ALCATEL CIT and Alcatel Mexico made large commission payments to at least one consultant, knowing that all or some of the money paid to that consultant would be paid to a close relative of a Honduran government official, with the high probability that some or all of the money would be passed on to the Honduran government official, in exchange for favorable treatment of Alcatel, ALCATEL CIT, and Alcatel Mexico.

20

55.     In or around 2002, at the request of the brother of Senior Government Official 2 in Honduras, ALCATEL STANDARD retained a new consultant in Honduras, Honduran Consultant 1, to perform vaguely described marketing and advisory services such as "maintaining liaisons with appropriate government officials." Honduran Consultant 1, however, was, in fact, an exclusive distributor of "brand name perfumes," and had no contacts in, or prior experience with, the telecommunications industry in Honduras or anywhere else. Rather, Honduran Consultant 1 was selected by Senior Government Official 2's brother, who instructed Sapsizian and an ACR employee to use Honduran Consultant 1 as an agent. Sapsizian and other ACR employees believed that all or some of the money paid to Honduran Consultant 1 would be paid to Senior Government Official 2 and the family of Senior Government Official 2 in exchange for favorable treatment.

56.     In retaining Honduran Consultant 1, ALCATEL STANDARD knowingly failed to conduct appropriate due diligence on Honduran Consultant 1 and did not follow up on numerous, obvious red flags. First, Honduran Consultant 1 was a perfume distributor with no experience in telecommunications. Honduran Consultant 1's Company Profile, signed by Honduran Consultant 1 and Alcatel's Area President, listed Honduran Consultant 1's main business as the distribution of "fine fragrances and cosmetics in the Honduran market." The Dun & Bradstreet report provided to the Executive 1 of ALCATEL STANDARD stated that the company was "engaged in cosmetic sales, house-to-house." Second, the brother of Senior Government Official 2 regularly communicated with Alcatel employees via an e-mail address from a domain name affiliated with Senior Government Official 2 and that official's family. Third, in or around late 2003, Senior Government Official 2's brother directly contacted

21

Alcatel's Area 1 President in an effort to collect sales commissions Alcatel owed to Honduran Consultant 1. Senior Government Official 2 then personally met with Alcatel's Area 1 President in March 2004 in Spain as part of this effort.

57.    Using ALCATEL STANDARD's agreement to retain Honduran Consultant 1 and ALCATEL CIT's and Alcatel Mexico's payments to Honduran Consultant 1, Alcatel, ALCATEL CIT, and Alcatel Mexico sought to secure an improper advantage in seeking business with Hondutel, and were able to retain contracts that may have otherwise been rescinded. In fact, Hondutel awarded Alcatel one contract in or around 2002: The Pair Gain Project, valued at approximately $1 million. Alcatel was awarded four additional contracts in or around 2003, for a combined contract value of approximately $47 million. These projects were: (1) the National Fiber Optic project; (2) the Fixed Lines project; (3) the National Radio Network project; and (4) the Hondutel call center project. ALCATEL CIT and Alcatel Mexico were able to retain these contracts in spite of significant performance problems.

58.    ALCATEL CIT and ACR employees arranged for several other Honduran government officials to take primarily pleasure trips to France, which were paid by ALCATEL CIT or ACR directly. From in or around 2002 to in or around 2004, a high-ranking executive of Conatel, Conatel Official, provided ALCATEL CIT and ACR employees with several sets of confidential internal Conatel documents, including confidential Hondutel bid documents. Conatel Official also provided confidential documents to the brother of Senior Government Official 2 indicating in his email that the documents were "for your eyes only." The brother forwarded these documents to ALCATEL CIT and ACR employees. ALCATEL CIT and ACR employees subsequently arranged for Conatel Official to travel to Europe on three separate

occasions, including one trip that had nothing to do with Alcatel business and for which the official received full reimbursement.

59.     A high-ranking executive at Hondutel, Hondutel Official, who was appointed to his position by Senior Government Official 2, also received gifts and improper payments from ALCATEL CIT and ACR employees.  In or around 2004, Hondutel Official solicited and then received a payment of approximately $2,000 from ACR for an educational trip for his daughter. ALCATEL CIT and ACR employees also arranged and paid for Hondutel Official to take a trip to Paris, France in or around 2003 with Hondutel Official's spouse.  During part of the 2003 trip to Paris, the Hondutel Official was lobbied to direct business to Alcatel, but most of the trip consisted of touring activities via a chauffeur-driven vehicle.

60.     ALCATEL CIT also made payments to a Hondutel attorney who worked on the Pair Gain contract.  ALCATEL CIT paid for a leisure trip to Paris taken by the attorney and the attorney's daughter in or around June 2003, and then made a payment to the attorney of approximately $1,500 to thank the attorney for the attorney's work on the Pair Gain contract. The Alcatel employee who helped arrange the trip to Paris was informed by an ALCATEL CIT employee that it was "based around the idea of a visit to Paris.  Versailles, Mont St. Michel, chauffeur, lido, excursion boat, . . . , hotel in Paris."  The itinerary for June 7, 2003, was listed as "Visit Germany (?) (unless they want to go shopping in Paris)."

61.     In engaging in the above-referenced conduct, employees of ALCATEL CIT, ALCATEL STANDARD, and ACR knowingly circumvented Alcatel's internal controls system and caused inaccurate and false entries in the books and records of ALCATEL CIT and ALCATEL STANDARD, whose financial results were included in the consolidated financial

statements of Alcatel submitted to the SEC.  ALCATEL CIT's financial results were included in

the consolidated financial statements of Alcatel submitted to the SEC.  As a result of the bribe

payments, Alcatel earned approximately $870,000 in profits.

### *Conduct in Malaysia*

62.     Alcatel also pursued business in Malaysia through Alcatel Malaysia.  Telekom

Malaysia was the largest telecommunications company in Malaysia and was controlled by the

government of Malaysia.  Telekom Malaysia was Alcatel Malaysia's largest client.  Celcom was

Telekom Malaysia's wholly owned subsidiary and focused exclusively on mobile

communications services.

63.     In at least  17 instances from in or around 2004 to in or around 2006, Alcatel

Malaysia employees, with the consent and approval of Alcatel Malaysia's management, such as

Executive 2 and Executive 3, made improper payments to Telekom Malaysia employees in

exchange for nonpublic information relating to ongoing public tenders.  The documents

purchased generally consisted of internal assessments by Celcom's tender committee of non-

public competitor pricing information.

64.     Eight of the 17 improper payments to Telekom Malaysia employees were made

in connection with a single public tender that Alcatel Malaysia ultimately won in or around June

2006:  Phase II of a two-part mobile network contract with Celcom, valued at approximately $85

million.  For each of these payments, Alcatel Malaysia employees created invoices falsely

referring to various types of "document fees," but on at least one occasion accurately referring to

"purchase of tender documents."  Each of these invoices was approved for payment by Alcatel

Malaysia's management, such as Executive 2 and Executive 3, and subsequently paid out of Alcatel Malaysia's petty cash account.

65.     Alcatel typically paid its agents and consultants commission rates based on the total value of a contract rather than pay a fixed fee for services. In late 2005 and early 2006, ALCATEL STANDARD, however, entered into consulting agreements with Malaysian Consultant 1 for more than $500,000 for marketing reports and studies. At the time payments were made to Malaysian Consultant 1, Alcatel Malaysia and ALCATEL STANDARD were aware of a significant risk that Malaysian Consultant 1 would pass on all or a part of these payments to foreign officials. None of the reports or studies appear to have ever been generated.

66.     Similarly, in mid-2005, ALCATEL STANDARD entered into a consulting agreement on behalf of Alcatel Malaysia with Malaysian Consultant 2 under which ALCATEL STANDARD agreed to pay a total of $500,000 for a "strategic intelligence report on Celcom's positioning in the cellular industry in relation to its competitors." Despite of paying Malaysian Consultant 2 half a million dollars for this report, as with Malaysian Consultant 1, there is no evidence that Malaysian Consultant 2 did any actual work for Alcatel Malaysia or ever produced the report. In or around June 2005, Malaysian Consultant 2 sent Executive 1 of ALCATEL STANDARD a copy of a thirteen-slide PowerPoint presentation, which appears to have been created by Celcom rather than Malaysian Consultant 2. When making this payment, executives of ALCATEL STANDARD and Alcatel Malaysia were aware of a significant risk that Malaysian Consultant 2 was serving merely as a conduit for bribe payments to foreign officials.

25

67.     Malaysia Consultant 1 worked for Alcatel Malaysia to benefit Alcatel before formal agreements were finalized and executed, under what were called "gentlemen's agreements," which required that consulting agreements be entered into retroactively.

68.     Alcatel Malaysia lacked internal controls, such as formal policies covering expenditures for gifts, travel, and entertainment for customers, leading to Alcatel Malaysia employees giving lavish gifts to Telekom Malaysia officials.

69.     Through the above-referenced conduct, ALCATEL STANDARD and Alcatel Malaysia knowingly circumvented Alcatel's internal controls system and caused inaccurate and false entries in the books and records of ALCATEL STANDARD and Alcatel Malaysia, whose financial results were included in the consolidated financial statements of Alcatel submitted to the SEC. Although Alcatel won the $85 million Celcom contract, Alcatel did not generate any profits from it.

### *Conduct in Taiwan*

70.     Alcatel also pursued business in Taiwan through its indirect subsidiary, Alcatel SEL. Executive 4 of Alcatel SEL hired two third-party consultants, Taiwanese Consultant 1 and Taiwanese Consultant 2, to assist Alcatel SEL and Taisel, an Alcatel joint venture, in obtaining an axle counting contract from the TRA initially valued at approximately $27 million. Both consultants claimed to have close ties to certain legislators in the Taiwanese government who were understood to have influence in awarding the contract due to their particular responsibilities in the legislature.

71.     In or around June 2000, Taiwanese Consultant 1 entered into a consulting agreement with ALCATEL STANDARD, which approved the agreement despite conducting

little due diligence on the consultant.  The Dun & Bradstreet report for Taiwanese Consultant 1, which was provided to ALCATEL STANDARD in or around 2001 after the consulting agreement was entered, indicated that attempts to contact Taiwanese Consultant 1 were unsuccessful as the telephone number, facsimile number, and address provided did not relate to Taiwanese Consultant 1.  The company profile, which was not signed by a Taiwanese Consultant 1 representative and the Alcatel Area President until in or around 2002, reflected that Taiwanese Consultant 1 had no relevant market experience or knowledge, indicating that the company's main line of business was "Trading for Bar Code Reader, Printer & Ribbon, POS terminal, DATA terminal, CASH draws."

72.    The original Taiwanese Consultant 1 consulting agreement provided for a 3% commission; amended agreements signed in or around March 2003 and in or around April 2004 provided that Taiwanese Consultant 1 would receive 4.75% and 6%, respectively, of the value of the contract.  The agreements provided that Taiwanese Consultant 1 would promote Alcatel SEL's efforts to secure the TRA axle counting contract, including providing advice and market intelligence and keeping Alcatel SEL informed of "potential clients' requirements, decisions and future plans."  Executive 1 of ALCATEL STANDARD signed the original agreement and the amended agreements.

73.    In fact, the purpose behind Alcatel's hiring of Taiwanese Consultant 1 was so that Alcatel SEL could make improper payments to three Taiwanese legislators who had influence in the award of the TRA axle counting contract.   On or about May 10, 2004, after Taisel had been awarded the contract, Alcatel SEL paid Taiwanese Consultant 1 a commission of approximately $921,413 by wire transfer from Alcatel SEL's ABN Amro bank account in New

York, New York. Taiwanese Consultant 1, in turn, made improper payments to two Taiwanese legislators: Legislator 2 and Legislator 3.

74.     Legislator 2 was a member of the Committee of Transport of the Legislative Council, which had oversight authority for telecommunications contracts in Taiwan. Legislator 2 assisted Alcatel SEL in convincing TRA that Alcatel SEL satisfied the technical requirements of the tenders. Legislator 2 also publicly supported Alcatel SEL's bid and provided advice to Alcatel concerning its TRA bid documents.

75.     Legislator 3 attempted to alter TRA's technical specifications to improve Alcatel SEL's bidding chances. Taiwanese Consultant 1 promised approximately $180,000 in campaign funds for Legislator 3's 2004 election campaign and then paid Legislator 3 approximately $90,000 in or around 2004, after Alcatel SEL won the bid. Taiwanese Consultant 1 kept some of the commission and kicked back approximately $150,000 to Executive 4.

76.     Executive 4 and Taiwanese Consultant 1 also spent approximately $8,000 on trips to Germany in or around May 2002 for an assistant in the office of Legislator 2, and in or around October 2003 for a secretary to the Taiwan Transportation and Communications Minister. Both trips were primarily for personal, entertainment purposes, with only nominal business justification. Indeed, the secretary of the Taiwan Transportation and Communications Minister brought his ex-wife on the trip, also at Alcatel's expense. Alcatel SEL paid for the hotel and meal expenses directly and reimbursed Executive 4 and Taiwanese Consultant 1 for train tickets, taxis, and gifts. According to a February 2006 Group Audit Services report, Alcatel SEL's management knew of and approved reimbursement of these expenses. In addition, in or around January 2004, Alcatel SEL paid Taiwanese Consultant 1 approximately $3,000 to reimburse it

28

for a set of crystal given to the secretary of the Taiwan Transportation and Communications Minister.

77.     In or around 2002, Executive 4 hired Taiwanese Consultant 2 on behalf of Alcatel SEL because Taiwanese Consultant 2's owner was the brother of Legislator 4, who had influence with respect to TRA matters.  Executive 4 met with Taiwanese Consultant 2's owner and Legislator 4, who requested that Alcatel SEL pay him a 2% success fee through Taiwanese Consultant 2 in connection with the axle counting contract.  To bribe Legislator 4, Alcatel SEL arranged for a bogus consulting agreement between Taisel and Taiwanese Consultant 2.  In reality, it was never expected that Taiwanese Consultant 2 would provide any legitimate services to Taisel.  On or about April 1, 2004, at Executive 4's instruction, Taisel signed a subcontract with Taiwanese Consultant 2 that called for Taisel to pay Taiwanese Consultant 2 approximately $383,895.  Taisel paid approximately $36,561 to Taiwanese Consultant 2 on or about May 12, 2004, by wire transfer.

78.     Neither Taiwanese Consultant 1 nor Taiwanese Consultant 2 provided legitimate services to Alcatel or Alcatel SEL.  Their only function was to pass on improper payments to three Taiwanese legislators on behalf of Alcatel SEL and Taisel.  On or about December 30, 2003, Taisel's bid was accepted by the TRA, which granted Taisel a supply contract worth approximately $19.2 million, an amount lowered from the originally proposed $27 million contract as a result of an alteration in the scope of the work required.

79.     Alcatel SEL's financial results were included in the consolidated financial statements of Alcatel submitted to the SEC.  As a result of the contracts won by Alcatel in Taiwan as a result of bribe payments, Alcatel earned approximately $4,342,600 in profits.

29

80.     In furtherance of the conspiracy and to achieve its purpose and objects, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Florida, and elsewhere, the following overt acts, among others:

### *Acts Involving Costa Rica*

81.     In or around June 2000, Sapsizian and ICE Official 1 discussed the assistance that other foreign officials in Costa Rica could provide to Alcatel.

82.     In or around November 2000, Sapsizian, on behalf of ALCATEL CIT, and Valverde, on behalf of ACR, offered ICE Official 1 1.5% to 2% of the value of the 400K GSM Contract in exchange for his assistance in ensuring that ICE would open the 400 GSM Contract to public bid.

83.     In or around December 2000, Sapsizian, on behalf of ALCATEL CIT, and Valverde, on behalf of ACR, agreed to pay 1.5% to 2% of the value of the 400K GSM Contract to ICE Official 1 in exchange for his assistance in opening a bid round.  After he agreed to the deal in principle with Sapsizian and Valverde, ICE Official 1 offered to share the payments with Senior Government Official 1.

84.     On or about January 23, 2001, the President of Area 1, on behalf of the Alcatel Group, signed a SAR and FSE for Servicios Notariales without performing appropriate due diligence as part of an internal controls program.

85.     On or about March 14, 2001, Executive 1, on behalf of ALCATEL STANDARD, signed a consultancy agreement for Servicios Notariales with a $100,000 lump sum payment plus a commission rate of 8.25% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

86.     On or about June 11, 2001, Executive 1, on behalf of ALCATEL STANDARD, signed a consultancy agreement for Intelmar with a commission rate of 1% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

87.     On or about August 30, 2001, Executive 1, on behalf of ALCATEL STANDARD, signed an amended consultancy agreement for Servicios Notariales increasing the commission rate to 9.75% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

88.     On or about October 7, 2001, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $800,000.

89.     On or about November 6, 2001, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $700,000.

90.     On or about November 19, 2001, Sapsizian, on behalf of ALCATEL CIT, emailed an Alcatel employee authorizing three payments to Servicios Notariales for the approximate amounts of: $800,000, $700,000, and $749,241.

91.     On or about December 6, 2001, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $749,271.

92.     On or about December 6, 2001, ALCATEL CIT caused a wire transfer of approximately $800,000 from its account at ABN Amro Bank in New York, New York, to an

31

account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

93.     On or about December 27, 2001, ALCATEL CIT caused a wire transfer of approximately $700,000 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

94.     On or about January 24, 2002, ALCATEL CIT caused a wire transfer of approximately $749,271 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

95.     On or about March 13, 2002, the President of Area 1, on behalf of the Alcatel Group, signed a SAR for Servicios Notariales without the Area President performing the appropriate due diligence as part of an internal controls program.

96.     On or about May 20, 2002, Servicios Notariales caused the purchase of four Certificates of Deposit (CDs) worth approximately $100,000, using funds from its account at Cuscatlan International Bank, in Costa Rica, in order to give those CDs to ICE Official 1.

97.     On or about June 25, 2002, Executive 1, on behalf of ALCATEL STANDARD, signed a consultancy agreement for Servicios Notariales concerning the 400K GSM Contract with a commission rate to 5.5% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

98.     On or about July 15, 2002, Executive 1, on behalf of ALCATEL STANDARD, signed a consultancy agreement for Intelmar concerning the 400K GSM Contract with a

32

commission rate of 1.25% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

99.    On or about July 22, 2002, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $1,380,085.

100.    On or about July 29, 2002, Valverde, on behalf of ACR, faxed the July 22 Servicios Notariales invoice for approximately $1,380,085 to "Mrs. Alcatel CIT (C/O C. Sapsizian)."

101.    On or about August 8, 2002, ALCATEL CIT caused a wire transfer of approximately $1,380,085 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

102.    On or about August 14, 2002, Servicios Notariales caused a wire transfer of approximately $100,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at Terrabank N.A., located in Miami, Florida, then to an account in the name of ICE Official 1's wife at Saint George Bank & Trust Co. Ltd in Panama.

103.    On or about August 16, 2002, Servicios Notariales caused a wire transfer of approximately $590,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at BCT Bank International in Panama.

104.    On or about September 13, 2002, the President of Area 1, on behalf of the Alcatel Group, signed a FSE for Servicios Notariales without the Area President performing the appropriate due diligence as part of an internal controls program.

105.    On or about September 19, 2002, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $704,100.

106.    On or about October 2, 2002, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $345,536.

107.    On or about October 7, 2002, Valverde, on behalf of ACR, faxed the invoices dated September 19, 2002, and October 2, 2002 to "Mrs. Alcatel CIT, (C/O Sapsizian)."

108.    On or about November 27, 2002, Executive 1, on behalf of ALCATEL STANDARD, signed a consultancy agreement for Servicios Notariales with a commission rate of 7.5% without Executive 1 performing the appropriate due diligence as part of an internal controls program.

109.    On or about November 28, 2002, ALCATEL CIT caused a wire transfer of approximately $1,049,636 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

110.    On or about December 9, 2002, Servicios Notariales caused a wire transfer of approximately $180,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at BCT Bank International in Panama.

34

111.    On or about February 12, 2003, Servicios Notariales submitted two invoices to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions," each in the approximate amount of $1,969,667.

112.    On or about February 18, 2003, Valverde, on behalf of ACR, faxed the two invoices for approximately $1,969,667 to "Mrs. Alcatel CIT, Attn: C. Sapsizian (France)."

113.    On or about March 1, 2003, Intelmar submitted an invoice to ALCATEL CIT for a payment in the approximate amount of $1,231,042.

114.    On or about March 27, 2003, ALCATEL CIT caused a wire transfer of approximately $3,939,334 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank, in Costa Rica.

115.    On or about April 2, 2003, Servicios Notariales caused a wire transfer of approximately $576,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at BCT Bank International in Panama.

116.    On or about April 7, 2003, ALCATEL CIT caused a wire transfer of approximately $1,231,042 from its account at ABN Amro Bank in New York, New York, to Intelmar's account at Cuscatlan International Bank in Costa Rica, from which account Intelmar paid hundreds of thousands of dollars to ICE Official 6.

117.    On or about June 19, 2003, ALCATEL CIT caused a wire transfer of approximately $1,099,630 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

35

118.    On or about July 7, 2003, Servicios Notariales caused a wire transfer of approximately $339,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at BCT Bank International in Panama.

119.    On or about September 26, 2003, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $1,155,418.

120.    On or about September 26, 2003, Servicios Notariales submitted an invoice to ALCATEL CIT, to the attention of Sapsizian, for partial payment of "commissions" in the approximate amount of $3,555,091.

121.    On or about October 20, 2003, ALCATEL CIT caused two separate wire transfers totaling approximately $1,178,764 from its account at ABN Amro Bank in New York, New York, to Intelmar's account at Cuscatlan International Bank in Costa Rica, from which account Intelmar paid hundreds of thousands of dollars to ICE Official 6.

122.    On or about October 23, 2003, ALCATEL CIT caused two separate wire transfers totaling approximately $4,710,509 from its account at ABN Amro Bank in New York, New York, to an account at a correspondent bank, the International Bank of Miami in Miami, Florida, for further credit to Servicios Notariales' account at Cuscatlan International Bank in Costa Rica.

123.    On or about October 27, 2003, Servicios Notariales caused a wire transfer of approximately $450,000 from its account at Cuscatlan International Bank in Costa Rica to an account in the name of ICE Official 1's wife at BCT Bank International in Panama.

36

### Acts Involving Honduras

124.    In or around February 2002, in Key Biscayne, Florida, Sapsizian, on behalf of ALCATEL CIT, and another ACR employee met with the brother of Senior Government Official 2 to discuss how the high-ranking official and Alcatel could assist each other.

125.    On or about November 12, 2003, Executive 1 of ALCATEL STANDARD executed a consultancy agreement with Honduran Consultant 1 concerning a National Fiber Optic contract without Executive 1 performing the appropriate due diligence as part of an internal controls program.

126.    On or about December 11, 2003, the brother of Senior Government Official 2 sent an email from a domain name affiliated with Senior Government Official 2 and the family of Senior Government Official 2 to Alcatel's Deputy Country Senior Officer for Central America stating that Alcatel had clearly "been favored with over $50 million of business" and had "access to the highest levels of government."

127.    On or about February 11, 2004, employees of ALCATEL CIT and ACR caused Alcatel Mexico, a wholly owned subsidiary of Alcatel, to wire transfer approximately $215,060 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

128.    On or about April 14, 2004, the owner of Honduran Consultant 1 sent a letter to the President of Area 1 stating that "thanks to our activities all doors remain open for Alcatel in Honduras: beginning with Hondutel, Conatel (regulating body) and up to and including the highest levels of the Executive Branch."

129. On or about June 2, 2004, employees of ALCATEL CIT and ACR caused Alcatel Mexico to wire transfer approximately $134,198 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

130. On or about June 25, 2004, Executive 1 of ALCATEL STANDARD executed a consultancy agreement with Honduran Consultant 1 concerning the Pair Gain project.

131. On or about September 23, 2004, ALCATEL CIT caused a wire transfer of approximately $45,586 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

132. On or about September 23, 2004, employees of ALCATEL CIT and ACR caused Alcatel Mexico to wire transfer approximately $41,022 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

133. On or about March 3, 2005, employees of ALCATEL CIT and ACR caused Alcatel Mexico to wire transfer approximately $161,726 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

134. On or about July 7, 2005, employees of ALCATEL CIT and ACR caused Alcatel Mexico to wire transfer approximately $26,667 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

135.    On or about June 29, 2006, ALCATEL CIT wire transferred approximately $80,130 from its account at ABN Amro Bank in New York, New York, to an account controlled by Honduran Consultant 1 at BAC International Bank in Panama.

### *Acts Involving Malaysia*

136.    On or about October 25, 2004, an Alcatel Malaysia employee made a payment of approximately $300 in cash to a Telekom Malaysia employee.

137.    On or about January 11, 2005, an Alcatel Malaysia employee made a payment of approximately $300 in cash to a Telekom Malaysia employee.

138.    On or about May 11, 2005, an Alcatel Malaysia employee made a payment of approximately $300 in cash to a Telekom Malaysia employee.

139.    On or about June 20, 2005, Executive 1, on behalf of ALCATEL STANDARD, executed a consulting agreement with Malaysian Consultant 2 under which ALCATEL STANDARD agreed to pay a total of $500,000 for a "strategic intelligence report on Celcom's positioning in the cellular industry in relation to its competitors" without Executive 1 performing the appropriate due diligence as part of an internal controls program.

140.    On or about June 6, 2005, an Alcatel Malaysia employee made a payment of approximately $790 in cash to a Telekom Malaysia employee.

141.    On or about June 29, 2005, an Alcatel Malaysia employee made a payment of approximately $790 in cash to a Telekom Malaysia employee.

142.    On or about September 1, 2005, ALCATEL STANDARD wire transferred approximately $500,000 from its account at Credit Suisse in Zurich, Switzerland, to Malaysian Consultant 2's account at Standard Chartered Bank in Hong Kong.

143.    On or about December 13, 2005, an Alcatel Malaysia employee made a payment of approximately $1,500 in cash to a Telekom Malaysia employee.

144.    On or about February 14, 2006, Executive 1, on behalf of ALCATEL STANDARD, executed a consulting agreement with Malaysian Consultant 1 under which ALCATEL STANDARD agreed to pay a total of approximately $200,000 for a series of market reports analyzing conditions in the Malaysian telecommunications market without Executive 1 performing the appropriate due diligence as part of an internal controls program.

145.    On or about January 13, 2006, an Alcatel Malaysia employee made a payment of approximately $900 in cash to a Telekom Malaysia employee.

146.    On or about January 16, 2006, an Alcatel Malaysia employee made a payment of approximately $600 in cash to a Telekom Malaysia employee.

147.    On or about February 6, 2006, an Alcatel Malaysia employee made a payment of approximately $1,500 in cash to a Telekom Malaysia employee.

148.    On or about February 15, 2006, an Alcatel Malaysia employee made a payment of approximately $6,000 in cash to a Telekom Malaysia employee.

149.    On or about March 13, 2006, ALCATEL STANDARD wire transferred approximately $100,000 from its account at Credit Suisse in Zurich, Switzerland, via its correspondent account at Deutsche Bank in New York, New York, to Malaysian Consultant 1's account at Calyon Bank in Hong Kong.

150.    On or about March 17, 2006, ALCATEL STANDARD wire transferred approximately $50,000 from its account at Credit Suisse in Zurich, Switzerland, via its

correspondent account at Deutsche Bank in New York, New York, to Malaysian Consultant 1's account at Calyon Bank in Hong Kong.

151.    On or about April 20, 2006, Executive 1, on behalf of ALCATEL STANDARD, executed a consulting agreement with Malaysian Consultant 1 under which ALCATEL STANDARD agreed to pay a total of approximately $310,000 for a "3G Technology and Broadband Wireless Access Market Study" without Executive 1 performing the appropriate due diligence as part of an internal controls program.

152.    On or about May 4, 2006, ALCATEL STANDARD wire transferred approximately $150,000 from its account at Credit Suisse in Zurich, Switzerland, via its correspondent account at Deutsche Bank in New York, New York, to Malaysian Consultant 1's account at Calyon Bank in Hong Kong.

153.    On or about June 12, 2006, ALCATEL STANDARD wire transferred approximately $160,000 from its account at Credit Suisse in Zurich, Switzerland, via its correspondent account at Deutsche Bank in New York, New York, to Malaysian Consultant 1's account at Calyon Bank in Hong Kong.

154.    On or about July 28, 2006, ALCATEL STANDARD wire transferred approximately $50,000 from its account at Credit Suisse in Zurich, Switzerland, via its correspondent account at Deutsche Bank in New York, New York, to Malaysian Consultant 1's account at Calyon Bank in Hong Kong.

### *Acts Involving Taiwan*

155.    On or about June 9, 2000, Executive 1, on behalf of ALCATEL STANDARD, executed a consultancy agreement with Taiwanese Consultant 1 in which ALCATEL

41

STANDARD agreed to pay Taiwanese Consultant 1 3% of the contract amount if Alcatel SEL won the TRA contract, without Executive 1 performing the appropriate due diligence as part of an internal controls program.

156.   On or about April 11, 2002, Executive 1 of ALCATEL STANDARD sent a letter to Taiwanese Consultant 2's owner promising Taiwanese Consultant 2 a 2% commission if Alcatel SEL's bid for the axle counting contract was successful, without Executive 1 performing the appropriate due diligence as part of an internal controls program.

157.   In or around May 2002, Alcatel SEL paid approximately $5,000 for travel expenses in connection with a trip taken to Germany by an assistant to Legislator 1 that was primarily for personal, entertainment purposes.

158.   On or about March 12, 2003, Executive 1, on behalf of ALCATEL STANDARD, executed an amended consultancy agreement with Taiwanese Consultant 1 in which ALCATEL STANDARD agreed to pay 4.75% of the contract amount if Alcatel won the TRA contract, without Executive 1 performing the appropriate due diligence as part of an internal controls program.

159.   In or around October 2003, Alcatel SEL paid approximately $3,000 for travel expenses in connection with a trip taken to Germany by a secretary to the Taiwan Transportation and Communications Minister that was primarily for personal, entertainment purposes.

160.   In or around January 2004, Alcatel SEL paid Taiwanese Consultant 1 approximately $3,000 to reimburse it for a set of crystal given to the secretary to the Taiwan Transportation and Communications Minister.

161.    On or about March 15, 2004, Taiwanese Consultant 1 sent Alcatel SEL an invoice for approximately $921,413.

162.    On or about April 1, 2004, at Executive 1's instruction, Taisel executed a subcontract with Taiwanese Consultant 2 that called for Taisel to pay Taiwanese Consultant 2 approximately $383,895, which bypassed internal controls.

163.    On or about April 15, 2004, Executive 1, on behalf of ALCATEL STANDARD, executed an amended consultancy agreement with Taiwanese Consultant 1 in which ALCATEL STANDARD agreed to pay 6% of the TRA contract amount, without Executive 1 performing the appropriate due diligence as part of an internal controls program.

164.    On or about April 28, 2004, Taiwanese Consultant 2 submitted an invoice to Taisel for a down payment in the amount of approximately $36,561.

165.    On or about May 10, 2004, Alcatel SEL wire transferred approximately $921,413 from its account at ABN Amro Bank in New York, New York, to Taiwanese Consultant 1's bank account at the Taiwan branch of the International Commercial Bank of China.

166.    In or around 2004, after receiving the commission in the amount of approximately $921,413 from Alcatel SEL, Taiwanese Consultant 1 paid approximately $90,000 to Legislator 2.

167.    On or about May 12, 2004, Taisel wire transferred approximately $36,561 to Taiwanese Consultant 2's account at the Standard Chartered Bank in Taiwan.